THE WASHINGTON POST, Appellant,

v.

Honorable Deborah
ROBINSON, Appellee.

No. 90–5119.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 15, 1991.

Decided April 19, 1991.

As Amended on Denial of Rehearing
June 14, 1991.

Michael A. Simons, Westbury, N.Y., for appellant. Boisfeuillet Jones, Jr. and Barbara P. Percival, Washington, D.C., were on the brief for appellant.

Madelyn E. Johnson, Asst. U.S. Atty., Dept. of Justice, with whom Jay B. Stephens, U.S. Atty., John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., Dept. of Justice, Washington, D.C., were on the brief, for appellee.

Before WALD, RUTH BADER GINSBURG and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

The Washington Post ("Appellant"), appeals from a district court order denying appellant's petition for a writ of mandamus to compel Magistrate Judge Robinson to release portions of a plea agreement filed under seal in *United States v. McWilliams*, Cr. No. 90–0072M–01, and affirming the Magistrate Judge's order sealing the plea agreement in the *McWilliams* case. The district court found that Magistrate Judge Robinson followed proper procedures for sealing the plea agreement and that compelling interests justified the sealing order.

We disagree and hold that the minimum procedures necessary to protect the first amendment right of access to plea agreements and related documents were not followed and that the government did not meet its burden of demonstrating a compelling interest to justify sealing the agreement. Therefore, we vacate both the district court's affirmance and Magistrate Judge Robinson's decision to seal the plea agreement.

## I. BACKGROUND

This appeal arises out of events following the arrest of then-Mayor of the District of Columbia, Marion Barry, for cocaine possession. One of the key figures in the investigation was District employee James McWilliams. At an open plea hearing on January 30, 1990, McWilliams appeared before Magistrate Judge Deborah Robinson to enter a plea of guilty to one count of aiding and abetting possession of cocaine base.[1] Plea agreements are generally filed

---

1. McWilliams pled guilty to an information that had been filed by the United States Attorney that morning. The information, which was not filed under seal, stated:

   The United States Attorney charges that:
   On or about December 19, 1988, within the District of Columbia, the defendant, JAMES McWILLIAMS, unlawfully, knowingly and in-

on the public record. At the beginning of the McWilliams hearing, however, the United States Attorney requested that the entire plea agreement be filed under seal. No motion to that effect had been filed or docketed in advance. The government provided no justification for sealing the plea agreement at the time of its oral request. Nor did the Magistrate Judge at that time afford any opportunity for interested persons to object to the sealing order,[2] or articulate any findings on the record to support her decision to seal the plea agreement. The plea agreement was accepted as Government's Exhibit 1 and sealed in its entirety on January 30, 1990. *See United States v. McWilliams*, No. 90–0072M–01, Transcripts of Hearing at 3 ("January 30 Order").

On February 6, 1990, appellant, Washington Post, filed a motion to intervene in the proceeding in order to obtain access to the sealed plea agreement. In its motion, appellant challenged the Magistrate Judge's January 30 Order sealing the entire plea agreement on the grounds that she did not follow the appropriate procedures for sealing a court document and that there was no compelling interest justifying this sealing order. The government then filed under seal its opposition to appellant's motion. On March 29, 1990, the Magistrate Judge issued a Memorandum Order, also filed under seal, granting appellant's motion in part by releasing portions of the plea agreement and denying it in part by continuing to keep portions of the plea agreement under seal. *See United States v. McWilliams*, Mag.Cr. No. 90–0072M, Memorandum Opinion ("March 29 Order"). The Magistrate Judge filed on the public record a "Notice of Filing of Memorandum Order Under Seal," which stated:

The parties are hereby notified that on March 29th, 1990, the undersigned filed, under seal, a Memorandum Order granting in part and denying in part the Motion of the Washington Post to Intervene and for Access. Specifically, the undersigned found that there are compelling governmental interests which justify maintaining under seal certain portions of the plea agreement filed under seal in the instant case on January 30, 1990. Accordingly, it was ordered that those portions of the plea agreement remain under seal, and that the remainder of the agreement be unsealed.

No other information regarding the original or subsequent justification for sealing the plea agreement was provided on the public record.[3]

Appellant then filed in district court a petition for writ of mandamus challenging the Magistrate Judge's partial denial of appellant's motion. Appellant also filed an appeal of the Magistrate Judge's original January 30 Order and the subsequent March 29 Order to seal portions of the plea agreement and related documents. The district court denied appellant's petition for writ of mandamus and affirmed the Magistrate Judge's decision to seal the plea agreement, adopting her reasoning "that compelling governmental interests justified sealing certain sections of the agreement." *The Washington Post v. Robinson*, No. 90–0095–AER, Order ("District Court Order") at 2.

On June 22, 1990, the government introduced the McWilliams plea agreement as an exhibit in the trial of Marion Barry in connection with McWilliams' testimony at that trial. *See United States v. Barry*, Cr. No. 90–0068, Government's Exhibit 19. At that time the plea agreement became avail-

tentionally did aid and abet another person in possessing cocaine base, also known as crack, a Schedule II narcotic drug controlled substance.

**2.** McWilliams joined in the government's motion to seal the plea agreement, so he was not likely to object.

**3.** The government did publicly file a redacted version of its sealed opposition, but the redacted opposition discussed only the general legal standards applicable to sealed criminal records; it did not identify the compelling interest of the government in the sealing of the plea agreement. The appellant remained in the dark as to the reasons for sealing the plea agreement until the plea agreement, the government's opposition and supporting documents, and the Magistrate Judge's March 29 Memorandum Order were finally released.

able as part of the public record in the *Barry* case, although it remained under seal in the *McWilliams* case. On December 20, 1990, the government moved to unseal the sealed portions of the McWilliams plea agreement, as well as related sealed documents. Magistrate Judge Robinson granted the motion and unsealed the plea agreement, the government's opposition to appellant's motion to intervene, the government's declaration in support of its opposition, and the March 29 Memorandum Order. Appellant received copies of all previously sealed documents.

The sealed portion of the plea agreement revealed only the following general information as to the nature of McWilliams' agreement to cooperate with the government:

James McWilliams shall cooperate with this Office in good faith. He shall provide truthful, complete, and forthright information concerning himself and others wherever, to whomever, and in whatever form an attorney from this Office requests. The term "whatever form" includes, but is not limited to, oral responses to questions; sworn, written statements; interrogatories; sworn testimony before a grand jury; sworn testimony in court; documentary materials; and tangible evidence. The term "whomever" includes, but is not limited to, the Federal Bureau of Investigation, and the District of Columbia Metropolitan Police Department. He must attend all meetings at which his presence is requested with respect to the matters about which this Office inquires of him. He must abide by all federal, state, and local criminal laws throughout the period of his cooperation with this Office.

The previously sealed March 29 Order of the Magistrate Judge, however, stated that the sealed portions of the plea agreement "contain references which could either (1) disclose the nature and the scope of an ongoing grand jury investigation into public corruption and narcotics violations; or (2) disclose the fact of defendant's agreement to cooperate in the ongoing criminal investigation." March 29 Order at 10. The Magistrate Judge found on those facts that risk of injury to McWilliams was a sufficiently compelling reason to justify sealing the plea agreement because, according to the government, other cooperating witnesses in the same investigation had been threatened. *See id.* at 7. In addition, the Magistrate Judge credited the government's statement that McWilliams had indicated that his decision to cooperate might be undermined by pressure resulting from premature disclosure of his cooperation. Therefore, the Magistrate Judge held that sealing the plea agreement was justified because disclosure could jeopardize the ongoing criminal investigation and, specifically, McWilliams' willingness to cooperate. *See id.*

The Magistrate Judge's March 29 Order also stated that "[b]ecause some portions of the plea agreement have either already been made public, or they do not contain information which implicates the governmental interests at stake, an order sealing the entire agreement is broader than necessary to protect the Government's interests in this case."[4] *Id.* at 9–10. And, because "the government's interest lies in keeping the fact of defendant's cooperation confidential," the sealed portions of the plea agreement were to remain sealed only until such time as McWilliams' obligation to cooperate with the government was fulfilled. *See id.* at 13.

Although the Washington Post now has the entire plea agreement, the government's opposition documents, and the Mag-

---

**4.** The portions of the plea agreement that did not implicate the government's interest included those paragraphs that (1) defined the parties who were bound by the agreement, (2) set forth the government's right to provide the court with information relevant to sentencing, and (3) concerned the government's right to participate in any post-sentencing proceedings. The information that was already made public because it was discussed in open court included those portions of the plea agreement concerning (1) McWilliams' agreement to plead guilty, (2) the sentence that could be imposed, (3) McWilliams' inability to withdraw his plea of guilty if not satisfied with the sentence imposed, and (4) the effect of McWilliams' waiver of a trial. These paragraphs were released under the March 29 Order. *Id.* at 9.

istrate Judge's March 29 Order in hand, it has appealed to this court challenging the district court's affirmance of the Magistrate Judge's orders. Appellant challenges the district court's affirmance on three grounds: (1) that when the Magistrate Judge originally sealed the entire plea agreement at the government's request on January 30, 1990, she did not follow the minimum procedures necessary to protect the public's first amendment right of access to the plea agreement; (2) that the government did not demonstrate any compelling interest to justify sealing the plea agreement; and (3) that the Magistrate Judge should have made findings on the public record, relating to the nature of the compelling interest that justified the March 29 sealing order, in order to provide a record from which appellant could seek review. The government asserts that this case is moot because the entire plea agreement has now been unsealed. And if this case is not moot, the government contends that its interests in protecting an on-going criminal investigation, an on-going grand jury investigation, and McWilliams' safety, were compelling in this case, and that the Magistrate Judge followed the appropriate procedures for ordering the plea agreement sealed.

## II. THE MOOTNESS ISSUE

█ The government asserts that this case is moot because the plea agreement and related documents at issue here have since been made public. We think this is a classic case for application of the exception to the mootness doctrine for controversies that are "capable of repetition, yet evading review." *See Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 546, 96 S.Ct. 2791, 2797, 49 L.Ed.2d 683 (1976) (quoting *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911)). If "there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again," and "the challenged action was in its duration too short to be fully litigated prior to cessa-

tion or expiration," then the controversy is "capable of repetition, yet evading review." *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975); *see Press–Enterprise Co. v. Superior Court*, 478 U.S. 1, 6, 106 S.Ct. 2735, 2739, 92 L.Ed.2d 1 (1986) (*"Press–Enterprise II"*); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 603, 102 S.Ct. 2613, 2618, 73 L.Ed.2d 248 (1982); *Gannett Co. v. De Pasquale*, 443 U.S. 368, 377, 99 S.Ct. 2898, 2904, 61 L.Ed.2d 608 (1979). Such is the case here.

In *Gannett*, the Supreme Court held that Gannett's objections to a trial court's order closing to the public a suppression hearing in a criminal trial was a controversy "capable of repetition" because "it is reasonably to be expected that the petitioner, as publisher of two New York newspapers, will be subjected to similar closure orders entered by New York courts in compliance with the judgment of that State's Court of Appeals." *Gannett Co.*, 443 U.S. at 377–78, 99 S.Ct. at 2904; *see also Globe Newspaper Co.*, 457 U.S. at 602–03, 102 S.Ct. at 2617–18; *In re Reporters Comm. for Freedom of the Press*, 773 F.2d 1325, 1329 (D.C.Cir.1985). Similarly, in this case, appellant is a newspaper publisher in Washington, D.C., and can reasonably be expected to be denied access to plea agreements again.

The issue litigated here is also likely to evade review. If the government were correct that the case automatically became moot when the plea agreement was made public, appellate consideration of whether and when sealing a plea agreement is justified by the government's interest in protecting an ongoing criminal investigation would frequently be precluded; either the order would expire by its own terms, or the Magistrate Judge would, sua sponte or on government motion, release the agreement once the investigation and prosecution had ended. The sealing order in this case for instance, may have expired by its own terms as soon as McWilliams testified at the *Barry* trial,[5] even though the Magis-

---

**5.** We have no way of knowing for sure when McWilliams' obligation to the government was

fulfilled because the terms of the plea agreement did not limit McWilliams' cooperation to

trate Judge did not release the plea agreement at that time, but only after the government requested its release on December 20, 1990.

The Supreme Court has said that any order to close a criminal proceeding will likely "evade review" because criminal proceedings are typically of short duration and will likely be completed before the challenged order can be fully litigated. *See, e.g., Globe Newspaper Co.*, 457 U.S. at 603, 102 S.Ct. at 2618; *Gannett Co.*, 443 U.S. at 377, 99 S.Ct. at 2904; *see also Reporters Comm. for Freedom of the Press*, 773 F.2d at 1329. Thus, although this court has not yet applied the "capable of repetition, yet evading review" exception to sealed plea agreements, we have applied the exception to other kinds of court records, *see Reporters Comm. for Freedom of the Press*, 773 F.2d at 1328–30 (summary judgment and trial exhibits), and other circuits have applied it to plea agreements. *See, e.g., United States v. Haller*, 837 F.2d 84, 86 (2d Cir.1988); *In re Knight Pub. Co.*, 743 F.2d 231, 233 (4th Cir.1984). An order sealing a plea agreement based upon the defendant's cooperation in an independent criminal investigation is admittedly different from an order restraining access to a criminal proceeding. While a criminal proceeding is typically of short duration, a separate criminal investigation involving other persons might continue for a much longer time, indeed until the statute of limitations for the underlying offense expires. There is, therefore, a possibility that the issue presented in this case will not always evade review. Nevertheless, as this case and similar cases from other circuits show, a plea agreement may often be unsealed prior to appellate review due to the completion of a separate criminal prosecution. *See, e.g., Haller*, 837 F.2d at 86. There-

fore, because of the critical importance of *contemporaneous* access to plea agreements to the public's role as overseer of the criminal justice process, *see Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 592, 100 S.Ct. 2814, 2835–36, 65 L.Ed.2d 973 (1980) (Brennan, J., concurring) ("contemporaneous review in the forum of public opinion is an effective restraint on the possible abuse of judicial power"); *id.* at 572–73, 100 S.Ct. at 2825 (plurality opinion) (press functions as "surrogate for the public"); *Nebraska Press Ass'n*, 427 U.S. at 560–61, 96 S.Ct. at 2803 (1976), we hold that the issue falls into the "capable of repetition, yet evading review" exception and proceed to the merits.[6]

### III. THE MERITS

#### A. Right of Access to Plea Agreements and Related Documents

██ The first amendment guarantees the press and the public a general right of access to court proceedings and court documents unless there are compelling reasons demonstrating why it cannot be observed. *See Globe Newspaper Co.*, 457 U.S. at 606–07, 102 S.Ct. at 2620; *see also Press–Enterprise Co. v. Superior Court*, 464 U.S. 501, 510, 104 S.Ct. 819, 824, 78 L.Ed.2d 629 (1985) ("*Press–Enterprise I*"). "Where ... the State attempts to deny the right of access in order to inhibit the disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." *Globe Newspaper Co.*, 457 U.S. at 606–07, 102 S.Ct. at 2620.

Until today, this court had not decided whether this right of access to court proceedings extends to plea agreements.

---

the *Barry* investigation. The plea agreement merely stated:

> James McWilliams shall cooperate with this Office in good faith. He shall provide truthful, complete, and forthright information concerning himself and others wherever, to whomever, and in whatever form an attorney from this Office requests....

**6.** The government argues that the appellant could have sought expedited review of the dis-

trict court's decision. However, we have previously stated that taking into consideration "the possibility of expedited review ... would [not only] make the 'evading review' test virtually impossible to meet," but also risk wreaking havoc with the court's multitude of scheduling priorities, and we have refused to make requests for expedition a prerequisite to an "evading review" argument. *See Reporters Comm. for Freedom of the Press*, 773 F.2d at 1329.

However, at least three other courts have extended first amendment protection to plea agreements and related documents applying the two-part test set forth by the Supreme Court in trial closure cases. *See, e.g., Oregonian Pub. Co. v. United States Dist. Court,* 920 F.2d 1462, 1465 (9th Cir. 1990); *Haller,* 837 F.2d at 86; *In re Washington Post Co.,* 807 F.2d 383, 390 (4th Cir.1986). Under that test, the first amendment protects public access to an aspect of court proceedings if such access has historically been available, and serves an important function of monitoring prosecutorial or judicial misconduct. *See Press–Enterprise II,* 478 U.S. at 8, 106 S.Ct. at 2740; *Globe Newspaper Co.,* 457 U.S. at 605–06, 102 S.Ct. at 2619.

In accord with the rulings of our sister Second, Fourth, and Ninth Circuits, we now find that plea agreements have traditionally been open to the public, and public access to them "enhances both the basic fairness of the criminal [proceeding] and the appearance of fairness so essential to public confidence in the system." *Oregonian Pub. Co.,* 920 F.2d at 1465 (quoting *Press–Enterprise I,* 464 U.S. at 508, 104 S.Ct. at 823); *see Haller,* 837 F.2d at 86–87; *Washington Post,* 807 F.2d at 389. Therefore, there is a first amendment right of access to them.[7]

Having determined that there is a first amendment right of access to plea agreements, we must consider the procedural and substantive prerequisites to overcoming that right. We are guided by the Supreme Court's decision in *Press–Enterprise I:*

The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

*Press–Enterprise I,* 464 U.S. at 510, 104 S.Ct. at 824.

B. *Procedures for Sealing Plea Agreements*

■ The Second, Fourth and Ninth Circuits have followed *Press–Enterprise I* and held that specific findings must be articulated on the record at the time a plea agreement is sealed.[8] *See Oregonian Pub. Co.,* 920 F.2d at 1466; *Haller,* 837 F.2d at 87; *Washington Post,* 807 F.2d at 391. These courts have also ruled that notice and an opportunity to be heard are prerequisites to sealing a plea agreement. The Second Circuit stated that

[i]n the case of plea agreements, notice that the government has moved to seal the agreement should be promptly entered in the public docket files maintained by the district court clerk's office. Leave of the court may be sought to file the text of the motion to seal with the plea agreement attached under seal pending a disposition of the motion by the district court.

*Haller,* 837 F.2d at 87; *see also Oregonian Pub. Co.,* 920 F.2d at 1466; *Washington Post,* 807 F.2d at 390–91. Individual notice to interested persons is not required, so long as the sealing motions are "docketed

---

**7.** Appellant also claims that there is a common law right of access to court records and documents. Like our sister circuits, however, we reach the constitutional issues raised in the appeal because of the different and heightened protections of access that the first amendment provides over common law rights. *See Oregonian Pub. Co.,* 920 F.2d at 1467 ("In resolving the common law claim, we held that the press bore a threshold burden of showing that a compelling interest would be served by disclosure.... Where the first amendment supplies the right of access, the party seeking access has the benefit of the presumption that disclosure should be made; the burden is upon the proponent of

closure to justify a closure order."); *Washington Post,* 807 F.2d at 390 ("Under the common law, a trial court's denial of access to documents is reviewed only for abuse of discretion. Under the First Amendment, on the other hand, such a denial must be 'necessitated by a compelling government interest, and ... narrowly tailored to serve that interest.'") (citations omitted).

**8.** Two of those courts expressly held that these findings themselves, however, may be placed under seal when necessary. *See, e.g., Haller,* 837 F.2d at 87; *Washington Post,* 807 F.2d at 391.

reasonably in advance of their disposition so as to give the public and press an opportunity to intervene and present their objections to the court." *Washington Post,* 807 F.2d at 390 (quoting *In re Knight Pub. Co.,* 743 F.2d at 234).

We believe that our sister circuits have adequately identified the safeguards that will protect the first amendment rights of the press and the public, without unduly interfering with the workings of the judicial process. Accordingly, we hold similarly that in this circuit the following procedural prerequisites must be met before a motion to seal a plea agreement may be granted in all but the extraordinary case, for example where the physical safety of an individual may be at risk:

(1) The government must file a written motion to seal the plea agreement and notice of that motion must be entered in the public docket;

(2) The trial court must promptly allow interested persons an opportunity to be heard before ruling on the motion and entering the sealing order;

(3) The trial court must articulate specific findings on the record demonstrating that the decision to seal the plea agreement is narrowly tailored and essential to preserve a compelling government interest; however, the trial court may file its findings under seal if it is necessary to protect the secrecy of the plea agreement;[9]

(4) The trial court must also place the fact that it has sealed the plea agreement on the public docket; and

(5) The government may seek leave of the court to file under seal its written motion to seal along with the plea agreement itself, and any supporting documents, pending the disposition of the motion by the court; however, notice of the written motion to seal must be entered on the public docket, and interested individuals must be afforded an opportunity to be heard before the trial court ultimately rules on the motion and makes specific findings on the record.[10]

### 1. The January 30 Order

■ Applying the criteria outlined above, we review the two sealing orders at issue in this case. Looking first to the Magistrate Judge's January 30, 1990 order granting the government's motion to seal the entire plea agreement, we find that the minimum procedures necessary to protect the first amendment right of access to plea agreements were not followed. Specifically, the government failed to provide notice of its January 30 motion to seal the plea agreement; the motion was oral, not written, and it was not docketed. The lack of notice was compounded by the failure of the Magistrate Judge to allow interested parties an opportunity to intervene before ruling on the motion. Moreover, the Magistrate Judge ruled immediately on the motion without requiring any justification from the government for sealing the plea agreement. Finally, the Magistrate Judge failed to articulate any findings in support of the January 30 Order to seal the entire plea agreement.

The government argues that a written motion to seal is not necessary because the plea hearing was open to the public and notice was effectively given in the open courtroom when the oral motion was made.

---

**9.** The trial court should only seal that part of its findings that is necessary to protect the secrecy of the sealed plea agreement, and it must make every effort to explain as much of its decision as possible on the public record to enable an interested person to intelligently challenge the decision.

**10.** The Second Circuit provides for delay in the docketing of sealing motions and orders in "'extraordinary situations' when an individual might be at risk." *Haller,* 837 F.2d at 87. We do not today rule out the possibility that a situation might arise where the government could show substantial danger in even the docketing of such a motion or order. Upon a specific showing by the government of a compelling interest in confidentiality, for example that an individual's life or safety may be threatened, the trial court may postpone placing any entry on the public docket regarding a motion to seal the plea agreement. However, the government must still file, under seal, a written motion to seal and must support that motion with compelling reasons, and the trial court must make specific findings, under seal, supporting its decision to grant the motion.

We find, however, that advance notice of a motion to seal is generally necessary to afford interested parties an opportunity to intervene *before* the court hears and rules on the motion.

The government argues that this case posed an extraordinary situation, necessitating an immediate ruling on the motion, without advance notice or an opportunity for interested parties to express their views. We fail to see anything in this case that would have precluded the government from filing a written motion to seal (notice of which would be entered on the public docket), with the plea agreement attached, and then asking the court to seal both the motion and the plea agreement pending final disposition. This would have protected the secrecy of the plea agreement until the court ruled on the motion after hearing from interested parties. It would not, however, be accurate to characterize the January 30 Order as only a preliminary sealing of the plea agreement pending final disposition of the government's motion. The Magistrate Judge never expressed an intention to delay disposition of the government's motion pending a hearing, and the government never sought leave of the court to file the plea agreement under seal pending the court's disposition of the government's sealing motion. It was, in fact, nearly two months later before the court responded to appellant's motion to intervene. At that time, the Magistrate Judge held a hearing on *appellant's* motion, never suggesting that it was a belated hearing on the government's original sealing motion.

Because the Magistrate Judge failed to follow the minimum procedures necessary to sealing, we find that the district court erred in affirming the Magistrate Judge's January 30 Order to seal the entire plea agreement, and we vacate that affirmance, as well as the Magistrate Judge's January 30 Order.

### 2. The March 29 Order

■ We turn now to the Magistrate Judge's March 29, 1990 Order to seal portions of the plea agreement and unseal other portions. The March 29 Order followed appellant's motion to intervene for access to the sealed plea agreement. We find that the Magistrate Judge met the procedural prerequisites to sealing portions of the plea agreement in the March 29 Order: interested parties were given notice of the motion and allowed an opportunity to be heard, and the Magistrate Judge articulated specific findings on the record supporting her decision to keep portions of the plea agreement under seal. Although the Magistrate Judge sealed the March 29 Order, which contained her findings, she was entitled to do so in order to protect the secrecy of the sealed portions of the plea agreement. Likewise, the government was entitled to file under seal its briefs and declarations supporting the sealing of the plea agreement.

At this point we find that the Magistrate Judge's March 29th sealing of the government's and court's documents relating to the plea agreement fully complied with the procedures outlined above. We consider next the merits of the Magistrate Judge's decision to seal the plea agreement.

### C. *Substantive Requirements for Sealing Plea Agreements*

■ The first amendment creates a general presumption of access to plea agreements. That presumption can be overridden only if "(1) closure serves a compelling interest; (2) there is a substantial probability that, in the absence of closure, this compelling interest would be harmed; and (3) there are no alternatives to closure that would adequately protect the compelling interest." *Oregonian Pub. Co.*, 920 F.2d at 1466 (citing *Press–Enterprise II*, 478 U.S. at 13–14, 106 S.Ct. at 2742–43); *see also Washington Post*, 807 F.2d at 392. The government argues that disclosure of the plea agreement would have risked violating the secrecy of grand jury proceedings and impairing the ongoing criminal investigation of Marion Barry, and would have posed a threat to the safety of McWilliams and his family.

In *Haller*, the Second Circuit upheld the sealing of a plea agreement that discussed

in specific detail the defendant's agreement to testify in front of a grand jury "regarding his knowledge of criminal activity having to do with labor organization officers or employees in conjunction with employment practices at the Nine Mile Two Nuclear Power Plant." *Haller*, 837 F.2d at 88. The court held that sealing the agreement was necessary under Fed.R.Crim.P. 6(e)(5), in order to prevent disclosure of "matters occurring before a grand jury." In this case, however, the sealed contents of the plea agreement would not have disclosed any specific "matters occurring before a grand jury." Although the government asserts that the plea agreement had to be filed under seal "to protect sensitive matters affecting the ongoing grand jury investigation of alleged public corruption and narcotics violations," because "[t]he plea agreement [made] explicit reference to the fact that James McWilliams, who is a key witness, ... agreed to cooperate in that investigation and to provide grand jury testimony," United States' Memorandum in Opposition to the Washington Post's Motion to Intervene and For Access ("Opposition Memorandum") at 6, that assertion is not self-explanatory. The plea agreement disclosed only that McWilliams had agreed to cooperate with the United States:

> James McWilliams shall cooperate with this Office in good faith. · He shall provide truthful, complete, and forthright information concerning himself and others wherever, to whomever, and in whatever form an attorney from this Office requests....

The plea agreement did not mention the Barry investigation, or any other investigation, nor allude to any specific "matters occurring before a grand jury."

The government also contends that sealing the plea agreement was justified in this case because the agreement was "part of an ongoing criminal investigation that might be compromised or that might embarrass innocent parties if publicized." *Haller*, 837 F.2d at 88. The government asserts that McWilliams had "made statements that indicated that his decision to cooperate might [have been] undermined by pressure resulting from premature dis-

closure of his cooperation," and that "[r]elease of the agreement may [have made] it difficult to secure the cooperation of other ... witnesses, who might otherwise be willing to cooperate ... but who fear that their cooperation would become the subject of extensive media coverage." Opposition Memorandum at 7. Finally, the government claims that the safety of McWilliams and his family would have been placed at risk if the plea agreement had been disclosed, citing the fact that other cooperating witnesses in the investigation had been threatened: "The possibility of threats being made is not idle speculation since threats against other witnesses whose cooperation has been made known in this investigation already have been confirmed." Declaration of Richard Roberts at 2.

Although evidence that the release of a plea agreement may threaten an ongoing criminal investigation, or the safety of the defendant and his family, may well be sufficient to justify sealing a plea agreement in a different case, such assertions fail here. For it appears that the fact that the plea agreement was entered into in exchange for McWilliams' cooperation was already within the public knowledge. This court may take judicial notice of the existence of newspaper articles in the Washington, D.C., area that publicized the ongoing criminal investigation of the *Barry* case, and McWilliams' involvement and cooperation in that investigation. *See* Fed.R.Evid. 201(c); *Agee v. Muskie*, 629 F.2d 80, 81 n. 1, 90 (D.C.Cir.1980) (taking judicial notice of facts generally known as a result of newspaper articles). *The Washington Post* reported that Marion Barry had been arrested, that a grand jury investigation was in progress, that McWilliams was allegedly involved in a drug incident with Barry, that McWilliams had been arrested as a result of that incident, and that McWilliams would plead guilty and "cooperate" with the government regarding the Barry investigation. *See, e.g.,* York, *Ramada Witness to Testify; McWilliams Agrees To Talk as Part of Plea Agreement*, Wash. Post, Jan. 30, 1990, at A1. Indeed, an article publish-

ed in *The Washington Post* the day after the plea was taken, reported that "U.S. Attorney Jay B. Stephens ... called a news conference to announce that McWilliams's agreement to cooperate was 'another significant step' in the grand jury investigation of the mayor's alleged drug activities." York, *Ramada Witness Goes Before Grand Jury; McWilliams Deal Called Key in Barry Probe,* Wash. Post, Jan. 31, 1990, at A1.

Because disclosure of the contents of the plea agreement would only have confirmed to the public what was already validated by an official source—that McWilliams had agreed to cooperate with the government—it could hardly have posed any additional threat to the ongoing criminal investigation. *See CBS, Inc. v. United States Dist. Court,* 765 F.2d 823, 825–26 (9th Cir.1985) (noting that "information relating to cooperating witnesses and criminal investigations should be kept confidential in some cases," but not necessarily when "most of the information the government seeks to keep confidential concerns matters that might easily be surmised from what is already in the public record."). Nor, for the same reasons, is it evident how such disclosure could pose any extra threat to the safety of McWilliams and his family. *See In re The Herald Co.,* 734 F.2d 93, 101 (2d Cir.1984) ("Though the basis for apprehending harm to the defendant is apparent, the record raises a question as to whether the information sought to be kept confidential has already been given sufficient public exposure to preclude a closure order on this account.").

In sum, we find that the government did not demonstrate a compelling interest to justify sealing the plea agreement in this case, and that the Magistrate Judge erred in finding that a compelling interest did exist. We therefore vacate the district court's affirmance of the Magistrate Judge's March 29 Order, and the Magistrate Judge's March 29 Order itself.

### IV. CONCLUSION

Under the first amendment, plea agreements are presumptively open to the public and the press. Absent extraordinary cause, the public may be denied access to them only after notice on the public docket has been given of a motion to seal, so that interested parties have an opportunity to be heard, and after specific findings are made on the record that sealing the plea agreement is essential to preserve an overriding compelling interest and is narrowly tailored to serve that interest. In this case the necessary procedures were not followed and the justifications advanced by the government were not adequately demonstrated. Accordingly, we vacate the district court's affirmance, as well as the Magistrate Judge's decision to seal the plea agreement.

*It is so ordered.*

### UNITED STATES of America

v.

### Gregory C. BURROUGHS, Appellant.

### No. 90–3195.

United States Court of Appeals, District of Columbia Circuit.

Argued April 22, 1991.

Decided May 31, 1991.

Gregory B. English, Alexandria, Va. (appointed by the Court), for appellant.

William R. Cowden, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher, and Clendon H. Lee, Jr., Asst. U.S. Attys., were on the brief, Washington, D.C., for appellee.

Before BUCKLEY, WILLIAMS, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

RANDOLPH, Circuit Judge:

Gregory C. Burroughs was tried with Carla J. Nelson and Ronald B. Nelson on counts alleging possession and distribution of cocaine base. Ronald Nelson was acquitted of both offenses. Carla Nelson was convicted of both offenses, and of possession with intent to distribute marijuana and managing a place for the distribution of cocaine. The jury convicted Burroughs of one count of possession with intent to distribute more than five grams of cocaine base (21 U.S.C. §§ 841(a) and 841(b)(1)(B)(iii)), and acquitted him of the distribution charge (21 U.S.C. §§ 841(a) and 841(b)(1)(C)). Burroughs appeals Judge Hogan's denial of his motion for a mistrial.

On July 26, 1989, two undercover officers went to an apartment at 601 Edgewood Street in the District of Columbia to attempt to purchase cocaine. The apartment was leased to Carla Nelson and Herbert Johnson, who both lived there. Burroughs opened the door and let the officers into the apartment. There they met Johnson, who told Burroughs to fetch Carla Nelson from a back bedroom, which he did. Nelson came out and accepted a $20 bill from one of the officers. She then went into a third room and returned with several bags of "crack" cocaine. The officers chose one of the bags and left.

About 40 minutes later several officers executed a search warrant for the apartment, using a battering ram to enter. Inside they found Johnson, Ronald Nelson, and Burroughs around a table in a tiny dining area measuring approximately five feet by six feet. On the table was a large clear plastic bag containing 64 packets of crack cocaine. One officer found Carla

Nelson in a bedroom. In the closet of that room the officer found a red purse. The red purse contained the $20 bill used in the earlier undercover purchase, and four clear plastic bags holding crack cocaine. An officer searched Carla Nelson incident to her arrest and found eleven clear plastic bags of crack cocaine in her pockets. The officers also searched Burroughs, but found no crack cocaine.

Carla Nelson testified in her defense. She admitted giving crack cocaine to the undercover officer in exchange for money but denied that she had intended to sell the drugs. According to her, she took eleven bags of crack cocaine from a leather purse she found on the table in the dining area when she came home. (The purse Nelson described was never recovered by the police, despite their search of the apartment, and was not introduced at trial.) She said she was upset about this discovery and planned to flush the cocaine down the toilet. In an unresponsive answer during cross-examination she stated that Herbert Johnson (the court advised the jury that he was being tried separately) had told her that the purse belonged to Burroughs. Burroughs' counsel objected and moved for a mistrial. The court struck this hearsay and admonished the jury to disregard it, but refused to declare a mistrial.[1] The court gave a similar cautionary instruction in its charge to the jury.[2]

Burroughs' only argument is based on *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), which held that "a defendant is deprived of his rights under the Confrontation Clause when his nontestifying codefendant's confession naming him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant." *Richardson v. Marsh*, 481 U.S. 200, 201–02, 107 S.Ct. 1702, 1704–05, 95 L.Ed.2d 176 (1987). Mere recitation of *Bruton's* holding shows that it is inapposite. *Bruton* deals with joint trials in which a confession is properly admitted with respect to one defendant, but would be hearsay and thus inadmissible with respect to a codefendant. The resulting violation of the Confrontation Clause cannot be avoided by instructing the jury to perform, in the words of Judge Learned Hand, the "mental gymnastic" of considering the confession only in regard to the confessor's guilt, while disregarding its implication of the codefendant. *See Bruton*, 391 U.S. at 132 n. 8, 88 S.Ct. at 1626 n. 8, quoting *Nash v. United States*, 54 F.2d 1006, 1007 (2d Cir.1932). The jury here did not have to attempt any such mental gymnastic for the quite apparent reason that Carla Nelson's unresponsive answer, which did not amount to a confession by anyone, was not allowed into evidence for any purpose.

1. The court instructed as follows:

Ladies and Gentlemen, the last statement that Ms. Nelson made about someone telling her about the alleged owner of this bag being Mr. Burroughs, there is no evidence before you that's true, and that that statement I'm striking from the record as hearsay. It's a statement by someone else who is not here. It's not what she says, but it's a statement of what someone said to her. So as a result, I'm striking that.

As I informed you at the beginning of the trial in my preliminary instructions, there are times I sustain objections, and then you're not to speculate what the answer would have been, and then there's times that I'll instruct you that I've granted a motion to strike testimony or evidence that's improperly before you, and this is one of those occasions, and I'm striking from the record any remark that Ms. Nelson has made as to ownership of that bag, and you're to disregard that remark, not to refer to it during your deliberations or use it in any way in this case and just forget there was any statement by her that someone told her about ownership of that bag that was on the table. I'll instruct you further about this at the time we have final instructions, but you're to disregard that statement.

2. The instruction in the charge read as follows:

Ladies and Gentlemen, also, during the trial, I advised you at one point, instructed you to strike certain testimony from your mind. There was a reference made when Ms. Nelson was on the stand to a hearsay statement allegedly made by Mr. Johnson concerning ownership of the bag. Once again, I remind you not to refer to that statement, if you recall it at all, not to use it in your deliberations in any way, and to simply strike it from your memory.

The case is therefore not governed by *Bruton's* conclusive presumption that the jury will not, cannot, follow even the strongest instruction not to consider a co-defendant's confession against the nontestifying defendant implicated by it. 391 U.S. at 135–36, 88 S.Ct. at 1627–28. Burroughs thinks his case is at least analogous because, as in *Bruton,* Carla Nelson's statement tying him to the mysterious purse had such a "devastating" impact, 391 U.S. at 136, on the jury that the court's instructions to ignore it would likely have had no effect. Burroughs exaggerates. If the jury had not followed the court's admonitions and had instead credited what Carla Nelson blurted out on this topic, it is hard to see why it acquitted Burroughs of possession of the eleven bags of crack cocaine taken from her pockets (which she said she had taken from the leather purse on the table). Burroughs suggests that the jury might have been confused about what constituted constructive possession, despite the trial court's careful instruction on the subject. That is a possibility, though not a plausible one. The jury seemed to understand that one may be in possession of an item not on one's person. It convicted Carla Nelson of possessing the 64 packets of cocaine in the dining area even though she was elsewhere when the officers arrived.

The question remains whether Burroughs was entitled to a mistrial on the ground that the court's instructions could not cure whatever prejudice he may have suffered as a result of the unresponsive answer. Unlike the situation in *Bruton,* we do not answer that question by presuming that the jury will disregard the court's instructions. Quite the contrary. Unless there is some good reason for finding otherwise, and here there is none, trial courts and appellate courts proceed on the basis that the jury does comply. *Richardson,* 481 U.S. at 206, 107 S.Ct. at 1706–07. In ruling on a mistrial motion in these circumstances, the trial court evaluates the demeanor of the witness, the content of the stricken testimony, its likely impact, and the probable effect of cautionary instructions swiftly and firmly administered. These are necessarily matters of degree calling for the trial court's judgment during the often rapidly unfolding events of a trial. For these reasons a trial court's ruling on a mistrial motion will be reversed only for an abuse of discretion. *United States v. Williams,* 822 F.2d 1174, 1188 (D.C.Cir.1987). In view of the relatively minor impact of Carla Nelson's unresponsive and self-serving statement, and the stern nature of the trial court's admonition to the jury immediately after the statement was made and again in the final charge to the jury, the court acted well within its discretion in refusing to declare a mistrial.

*Affirmed.*

**UNITED STATES of America**

v.

**Larry P. BRADSHAW, Appellant.**

**No. 90–3105.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 16, 1991.

Decided June 7, 1991.

Susan L. Coskey, appointed by the Court, with whom Richard G. Taranto was on the brief, Washington, D.C., for appellant.

Shanlon Wu, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher, Thomas C. Black, Craig S. Iscoe, and Kathleen M. O'Connor were on the brief, Washington, D.C., for appellee.

Before MIKVA, Chief Judge, WALD and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Appellant Larry Bradshaw was convicted of one count of bank robbery and one count of attempted bank robbery. He was sentenced to 210 months. He challenges his convictions and sentence on several grounds. We find merit in one claim—that the district court admitted incriminating statements made by Bradshaw without determining whether his waiver of *Miranda* rights was knowing and intelligent—and, therefore, remand for that determination. On all other issues, we affirm the convictions and the sentence.

## I.

Bradshaw has a long history both of bank robberies and of mental illness. He first began showing symptoms of what was later diagnosed as schizophrenia in the late 1970's. By the early 1980's his condition became acute. After his condition intensified, Bradshaw robbed a bank in Montreal and attempted to rob one in Miami.[1] In 1986, the Veterans Administration initiated proceedings at the instigation of Bradshaw's family to have him committed as an incompetent. Before these proceedings concluded, however, Bradshaw disappeared. He was not heard from again until he was arrested later in the year in the District of Columbia for bank robbery. After a year of commitment and treatment with medication, Bradshaw was deemed competent to stand trial and pled guilty; he was sent by the court to the mental health division of a federal correctional facility. He was released seven months later and placed on probation on the condition that he seek continued treatment.

Bradshaw visited the VA Hospital, where a doctor prescribed intravenous medication. The hospital mailed the medication to Bradshaw, along with a self-injection kit, but Bradshaw was unable to determine how to administer it, and his health again deteriorated.

The events giving rise to the convictions on appeal occurred on January 9, 1989. Bradshaw testified that he began drinking heavily that morning and had consumed over a liter of liquor by afternoon. Early that afternoon, he entered a bank and demanded money from a teller and a manager. Each refused to give him any money (they were stationed behind bulletproof glass); instead, they activated the silent alarm system. Bradshaw pounded repeatedly on the glass but eventually left the bank.

One hour later, Bradshaw entered a second bank, where he proved superficially more successful. He told a teller to give him money and not to move or he would kill her. The teller gave Bradshaw approximately $6,000 in a bag, but the bag also included an explosive dye pack. The dye pack exploded shortly after Bradshaw left the bank, covering him with red dye. He was apprehended only a few blocks from the bank.

The police arrested Bradshaw and told him his *Miranda* rights both orally and in writing. He asked questions concerning his rights (the officers and Bradshaw disagree as to what he asked; their conflicting versions are discussed more fully *infra* at 300), and signed a form waiving them. He then gave a statement admitting that he committed the second robbery because he "just needed some money ... [and] did something foolish." He further admitted in the statement, contrary to his later testimony, that he was not drunk.

Before trial, Bradshaw moved to suppress this confession, arguing that as a result of his mental illness and the enormous amount of alcohol he claimed to have consumed he was unable knowingly and intelligently to waive his *Miranda* rights, and that his statement to the police was accordingly inadmissible. The district court denied the motion, apparently on the assumption that a waiver of *Miranda* rights is invalid only if caused by police coercion.

At trial, Bradshaw admitted to committing the acts charged and relied entirely on an insanity defense. Defense counsel sought to establish Bradshaw's insanity through expert testimony based in part on Bradshaw's past commitments but requested that the prosecution be prevented from cross-examination concerning the reason (the prior robberies) for the commitments. The prosecution objected and the court concluded that it would permit cross-examination on that issue. Defense counsel then asked the expert about Bradshaw's prior convictions on direct examination.

The jury reported itself unable to reach a verdict, but after an *Allen* charge found Bradshaw guilty of both attempted robbery and robbery. The district court found Bradshaw to be a career offender as defined by the sentencing guidelines and de-

---

**1.** He also forged a check in Seattle and fraudu-　lently obtained airline tickets.