ROGERS, Circuit Judge,
concurring in part and concurring in the judgment.
Like Judge Williams, I would apply the experience and logic analysis of Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 8-9, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (“Press-Enterprise II”), and so my conclusion about when the government’s interest in protecting information classified as SECRET will outweigh the public’s First Amendment interest is more tentative than Judge Randolph’s. At the same time, I tend to be less tentative than my colleagues about the nature of the historical background and the level of generality properly used in the analysis. Still, these analytical differences aside, the court is in agreement that the district court’s order making the redacted SECRET videotapes public must be reversed. See Op. at 1102 (Williams, J.); Op. at 1095-98 (Randolph, J.). I offer a few observations on my approach.
Although neither the Supreme Court nor this court has applied the qualified First Amendment right of access to judicial civil proceedings, in Press-Enterprise II, the Supreme Court explained that the access right extends to any judicial proceeding where there is a “tradition of accessibility” and “public access plays a significant positive role in the functioning of the particular process in question.” 478 U.S. at 8, 106 S.Ct. 2735. The First Amendment guarantees the “rights to speak and to publish concerning what takes place at a trial.” Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 576-77, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). The then-Chief Justice stated that *1099 “[w]hether the public has a right to attend trials of civil cases is a question not raised by this case, but we note that historically both civil and criminal trials have been presumptively open.” Id. at 580 n.17, 100 S.Ct. 2814. By its terms, the experience and logic test does not limit the right of access to criminal proceedings. Every circuit to consider the issue has concluded that the qualified First Amendment right of public access applies to civil as well as criminal proceedings. See Courthouse News Serv. v. Planet, 750 F.3d 776, 786 (9th Cir. 2014); N.Y. Civil Liberties Union v. N.Y.C. Transit Auth., 684 F.3d 286, 298 (2d Cir. 2012); Rushford v. New Yorker Magazine, Inc., 846 F.2d 249, 253-54 (4th Cir. 1988); Publicker Indus., Inc. v. Cohen, 733 F.2d 1059, 1070 (3d Cir. 1984); In re Cont’l Ill. Sec. Litig., 732 F.2d 1302, 1308 (7th Cir. 1984); In re Iowa Freedom of Info. Council, 724 F.2d 658, 661 (8th Cir. 1983); Newman v. Graddick, 696 F.2d 796, 801 (11th Cir. 1983). Speaking for the Second Circuit, Judge Calabresi explained that the “recognition of the right to attend civil trials derives from the fact that the First Amendment, unlike the Sixth, does not distinguish between criminal and civil proceedings, nor does its distinguish among branches of government.” N.Y. Civil Liberties Union, 684 F.3d at 298. “[Ojnce unmoored from the Sixth Amendment, there is no principle that limits the First Amendment right of access” to criminal proceedings. Id. (internal quotation marks omitted). As Judge Williams observes, “the fact that habeas proceedings are formally civil is no obstacle to use of the experience-and-logic framework.” Op. at 1104 (Williams, J.).
Efforts to sow doubt about this conclusion and the conclusion of our sister circuits are unpersuasive because they fail, in part, to acknowledge an important distinction between a criminal defendant’s rights and the public’s role in advancing observance of those rights. Judge Randolph notes that in United States v. Reynolds, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953), the Supreme Court distinguished between criminal and civil proceedings in addressing the government’s invocation of the military secrets privilege to block the release of information that the government claimed involved national security. See Op. at 1092-93 (Randolph, J.). But the Court did so in the context of highlighting that the government could not rely on the state secrets doctrine when it had prosecuted the defendant: “it is unconscionable to allow [the government] to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense.” Reynolds, 345 U.S. at 12, 73 S.Ct. 528. The distinction drawn by the Court arose in the context of protecting the rights of the accused, not to indicate that the public’s right of access is more robust in criminal than in civil proceedings. Because the First Amendment right of access is enjoyed by the public, whether the “government is ... the moving party” has little bearing on the First Amendment analysis. Op. at 1092 (Randolph, J.) (quoting Reynolds, 345 U.S. at 12, 73 S.Ct. 528). The same is true of the Classified Information Procedures Act (“CIPA”), which Congress passed to “limit the practice of defendants threatening to disclose classified information in order to force the government to dismiss the charges.” Id. at 1092 n.9. Because the constitutional right of access belongs to third parties, laws governing the relationship between litigating parties are of little consequence to the application of Press-Enterprise II here.
Furthermore, in raising questions about the nature of the historical tradition and its level of generality, a word of caution is in order. See Op. at 1104-06 (Williams, J.); Op. at 1092-94 (Randolph, J.). At least as early as 1866, habeas applications were filed in open court in the United States. Ex *1100 Parte Milligan, 71 U.S. 4 Wall. 2, 5, 18 L.Ed. 281 (1866)). It is true that in holding the right to attend criminal trials is implicit in the guarantees of the First Amendment, the Supreme Court in Richmond Newspapers traced “an unbroken, uncon-tradicted history” of public accessibility, 448 U.S. at 573, 100 S.Ct. 2814, beginning prior to the Norman Conquest. But it is also true that the Court subsequently concluded in Press-Enterprise II that the practice of state and federal courts in the 19th century onward sufficed to establish a history of access to preliminary hearings in criminal cases. 478 U.S. at 10, 106 S.Ct. 2735 (emphasis added); see id. at 22, 106 S.Ct. 2735 (Stevens, J., dissenting) (“[I]t is uncontroverted that a common-law right of access did not inhere in preliminary proceedings at the time the First Amendment was adopted.”). And in Washington Post v. Robinson, 935 F.2d 282, 288 (D.C. Cir. 1991), this court, joining three other circuits, held that a qualified right of access applies beyond the criminal trial itself to executed plea agreements and related documents. Because “plea bargaining was probably nonexistent before 1800” in the United States, Mark H. Haller, Plea Bargaining: The Nineteenth Century Context, 13 Law & Soc’y Rev. 273, 273 (1979); see also George Fisher, Plea Bargaining’s Triumph, 109 Yale L.J. 857, 1017-24 (2000), this court apparently relied on post-ratification practices in concluding that “plea agreements have traditionally been open to the public.” Robinson, 935 F.2d at 288. Yet my colleague suggests that pre-ratification practices should be the focus of our inquiry. See Op. at 1092-94 (Randolph, J.).
The Supreme Court has not required there be a history of absolute accessibility to satisfy the “experience” prong; a “near uniform practice of state and federal courts” suffices. Press-Enterprise II, 478 U.S. at 10, 106 S.Ct. 2735 (emphasis added); see id. at 10 n.3, 106 S.Ct. 2735. There can be “gaps.” Op. at 1106 (Williams, J.). In Press-Enterprise II, the Court acknowledged an historical “tradition of accessibility” for state and federal preliminary hearings even though several states had “no historical counterpart,” 478 U.S. at 10 & n.3, 106 S.Ct. 2735, and had only recently recognized a right of public access to preliminary hearings in view of their importance to the criminal trial. Id. at 10 n.3, 106 S.Ct. 2735; see also id. at 24-25, 106 S.Ct. 2735 (Stevens, J., dissenting). The Court contrasted grand jury proceedings, which have ‘Traditionally been closed to the public,” id. at 10, 106 S.Ct. 2735, because their “proper functioning ... depends upon the[ir] secrecy,” id. at 9, 106 S.Ct. 2735. Nonetheless, in relying on English history from the 16th to 18th centuries, my colleagues appear unpersuaded, surprisingly, that the overwhelming practice of open habeas corpus proceedings — at least 80% — establishes a sufficient tradition of accessibility. See Op. at 1093-94 (Randolph, J.); Op. at 1105-06 (Williams, J.). The author on whom they rely suggests that the in-chambers habeas practice may be explained by the limited terms of court, the need for prompt issuance of writs to ensure compliance with court orders, and judicial vacations and travel — all when modern forms of communication were non-existent. Paul D. Halliday, Ha-beas Corpus: from England to Empire 53-58 (2010). In other words, there was a well-settled expectation that habeas proceedings would be open to the public when the courts were in session.
Neither does this case present the occasion to define the meaning of “judicial record” in a manner contrary to the understanding of the district court and the parties, and how this court has viewed filings in habeas cases. See Op. at 1103-04 (Williams, J.); see also Parhat v. Gates, 532 F.3d 834, 836 (D.C. Cir. 2008). No issue is presented to this court concerning the “ju *1101 dicial” nature of the SECRET videos filed by Dhiab’s counsel in the district court. Even so, on its own terms, the suggested definition would appear to be overly restrictive, excluding from the category of “judicial records,” for example, certain pleadings by a party. See Fed. R. Crv. P. 7, 79.
As for the logic part of the Press-Enterprise II test, it is true that there is no instruction manual as such for lower courts on “choosing the level of generality at which to assess the ‘proceeding.’ ” Op. at 1105 (Williams, J.). Supreme Court precedent is itself a guide, however, and it indicates that a high level of generality can be appropriate. In Press-Enterprise II, 478 U.S. at 10, 106 S.Ct. 2785, the Court applied the experience and logic test to preliminary hearings in California, concluding that because “preliminary hearings conducted before neutral and detached magistrates” in other state and federal courts have traditionally been open, there was a tradition of access that applied to the California proceeding. The Court made no mention of the “substantial variations in the structure of the preliminary hearing as it is conducted throughout the country.”
Jesse H. Choper, Consequences of Supreme Court Decisions Upholding Individual Constitutional Rights, 88 Mich. L. Rev. 1, 112 (1984) (quoting Y. Kamisar, W. LaFave & J. Israel, Modern Criminal Procedure: Cases-Comments-Questions 963 (5th ed. 1980)); see also Note, The Function of the Preliminary Hearing in Federal Pretrial Procedure, 83 Yale L.J. 771, 773-74 (1974). For example, the New Hampshire Supreme Court, in ruling that hearsay was admissible at preliminary hearings, noted that the highest court in another state had taken a “contrary position,” and that “[s]uch decisions are based upon different statutes, [and] a different view of the purpose of a probable cause hearing.” State v. St. Arnault, 114 N.H. 216, 317 A.2d 789, 791 (1974) (citing Myers v. Commonwealth, 363 Mass. 843, 298 N.E.2d 819 (1973)). By lumping together the various state and federal preliminary hearings when applying the experience and logic test, the Supreme Court suggests that a lower court may properly apply the test at a fairly high level of generality. The writ of habeas corpus has never been a “static, narrow, formalistic remedy,” Jones v. Cunningham, 371 U.S. 236, 243, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963), but one whose scope and application has “changed depending upon the circumstances,” Boumediene v. Bush, 553 U.S. 723, 779, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008). Taken together, that would mean viewing Dhiab’s habe-as proceeding as falling within the tradition of open habeas proceedings generally, rather than singling out habeas petitions filed by Guantanamo detainees for a separate test.
The qualified First Amendment right of access fits well with the privilege of habeas corpus, which was originally “one of the few safeguards of liberty specified in [the] Constitution.” Id. at 739, 128 S.Ct. 2229. Because criminal trials and habeas proceedings are designed to protect against abuses of Executive power and guard individual liberty, why would the First Amendment right of access apply differently in the two proceedings? “Courts and commentators have long recognized the centrality of openness to adjudicatory proceedings: ‘Without publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account.’” N.Y. Civil Liberties Union, 684 F.3d at 296 (quoting In re Oliver, 333 U.S. 257, 271, 68 S.Ct. 499, 92 L.Ed. 682 (1948) (quoting 1 Jeremy Bentham, Rationale of Judicial Evidence 524 (1827))). The qualified right of public access plays a significant positive role in criminal proceedings by ensuring that “standards of fairness are being observed.” Press-Enterprise Co. v. Superior Court, 464 U.S. 501, 508, 104 *1102 S.Ct. 819, 78 L.Ed.2d 629 (1984); see also Richmond Newspapers, 448 U.S. at 569, 100 S.Ct. 2814. In habeas proceedings, the absence of a jury, “long recognized as an inestimable safeguard against the corrupt or overzealous prosecutor and against the complaint, biased or eccentric judge[,] makes the importance of public access ... significant.” Press-Enterprise II, 478 U.S. at 12-13, 106 S.Ct. 2735 (quoting Duncan v. Louisiana, 391 U.S. 145, 156, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968)). Also, “[t]o the extent the First Amendment embraces a right of access to criminal trials, it is to ensure that th[e] constitutionally protected discussion of governmental affairs is an informed one.” Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 604-05, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982) (internal quotation marks omitted); see also Richmond Newspapers, 448 U.S. at 576-77, 100 S.Ct. 2814. Because the writ of habeas corpus is an important part of our Constitution and a “vital instrument for the protection of individual liberty,” Boumediene, 553 U.S. at 743, 128 S.Ct. 2229, the public’s qualified right to informed discussion about its government would apply no less in these proceedings.
Nor is there reason to conclude that when the Supreme Court articulated the experience and logic test, “it could not possibly have had in mind classified national security information.” Op. at 1092 (Randolph, J.). The Court’s test protects against threats to our nation’s security by prohibiting disclosure when it will cause a “substantial probability” of harm to an “overriding interest.” Press-Enterprise II, 478 U.S. at 7, 14, 106 S.Ct. 2735. The right to access judicial proceedings “give[s] meaning to [the] explicit guarantees” of freedom of speech and press, Richmond Newspapers, 448 U.S. at 576, 100 S.Ct. 2814, and the Court is well aware that First Amendment rights will often clash with national security concerns, see, e.g., Dennis et al. v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951). Yet the Court crafted a test where the threshold First Amendment question is whether “the particular process in question” passes the experience and logic test, Press-Enterprise II, 478 U.S. at 8, 106 S.Ct. 2735; see also Op. at 1102, 1104 (Williams, J.), not whether the records submitted in that proceeding contain classified information. Because the test accounts for the protection of national security information, the presence of such information in a judicial proceeding does not crowd out the decades-old and flexible approach set forth in Press-Enterprise II.